UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHAQUAN JORDAN,

                              Plaintiff,

        vs.                                   9:08-CV-1294
                                             (GLS/ATB)

STATE OF NEW YORK, *et al.*,

                         Defendants.

_____

SHAQUAN JORDAN, Plaintiff *Pro Se*
BRIAN J. O'DONNELL, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

       This matter was referred by United States District Judge Gary L. Sharpe, for

Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules

N.D.N.Y. 72.3(c).  The case was transferred to me on January 4, 2010, following the

retirement of U.S. Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 45).

       In this civil rights complaint, plaintiff alleges that he was assaulted by

defendant Stoughton and two unnamed corrections officers on May 1, 2008.  Plaintiff

claims that after the assault, he was denied the opportunity to get medical treatment by

a third unnamed corrections officer, and when plaintiff eventually went to the medical

department for treatment, defendant Nurse Harriman denied plaintiff constitutionally

adequate medical care for his injuries.  Plaintiff seeks substantial compensatory and

punitive damages.

       Presently before the court is a motion for summary judgment pursuant to Fed.

R. Civ. P. 56, filed on behalf of all defendants and a cross-motion for summary

judgment filed by plaintiff. (Dkt. Nos. 40, 41).  For the following reasons, this court

will recommend that defendants' motions for summary judgment be granted in part

and denied in part, and that plaintiff's cross-motion be denied.

## DISCUSSION

### I.     Facts

#### A.     Plaintiff's Allegations

In his complaint, plaintiff alleges that on May 1, 2008, between 3:30 and 4:00

p.m., he was participating in the "medication run" for C-Block, 5-Company at Clinton

Correctional Facility. (Compl. ¶ 15).[1]  Plaintiff suffers from arthritis in his lower back,

for which he receives pain medication on a daily basis. *Id.*  During the medication run,

inmates are escorted by corrections officers to the "Hospital II" to obtain their

medication from a nurse.

Plaintiff states that after the nurse gave him his medication on May 1, 2008, and

after all the other inmates were given their medications, defendant Stoughton told the

inmates to "take it back down the stairs." (Compl. ¶ 16).  While the inmates were

going back down the stairs, defendant Stoughton ordered plaintiff to step out of the

line, "away from the other inmates" and place his hands on the wall for a "pat-frisk."

(Compl. ¶¶ 16-17).  Plaintiff claims that when he placed both of his hands on the wall,

defendant Stoughton "rushed, grabbed and pushed Plaintiff into a vacancy [sic] room

in hospital II." (Compl. ¶ 18).  Plaintiff claims that as soon as he was in the vacant

---

[1] Plaintiff has filed a lengthy complaint. (Dkt. No. 1).  He has numbered the paragraphs of his complaint sequentially.  Thus, the court will cite to the paragraphs of the complaint as numbered by plaintiff.

room, defendant Stoughton and two unknown officers brutally assaulted plaintiff by punching and kicking him until he fell to the floor and then continued to punch and kick him repeatedly. (Compl. ¶¶ 19-20). When the beating was over, plaintiff could "hardly bend his left knee all the way," and he sustained "multiple bruises and [contusions] on his forehead and began experiencing severe and critical pain [in] his lower back." (Compl. ¶ 21).

Plaintiff claims that after the assault, he was forced to walk back to his cell, even though he could hardly walk. (Compl. ¶ 28). When he got back to his cell, plaintiff alleges that he told the C-Block Company officer, defendant John/Jane Doe # 3, that he was in serious need of medical attention, due to the severe beating he had just sustained, but defendant John/Jane Doe # 3 refused plaintiff's request to return to the hospital. (Compl. ¶ 28). Plaintiff claims that he was then left in his cell overnight in severe pain. (Compl. ¶ 29).

At 7:00 a.m. the next morning, plaintiff claims that he spoke to a different corrections officer about his injuries and requested emergency sick-call. (Compl. ¶ 31). This new officer had plaintiff escorted to the hospital. *Id.* Before being treated, plaintiff states that he was interviewed by Sergeant Giambruno,[2] who wanted to interview plaintiff in order to find out why plaintiff "was all beaten and bruised up." *Id.* Plaintiff states that, after he gave Sergeant Giambruno a statement, the sergeant

---

[2] The plaintiff misspelled this sergeant's name. A review of the grievance documents attached to defendants' motion for summary judgment shows that Sergeant Giambruno conducted an investigation of plaintiff's allegations on May 2, 2008. (Dkt. No. 48-8 at 12). The court will use the proper spelling of this sergeant's name.

had an officer take pictures of all the injuries that plaintiff sustained from the brutal assault. *Id.*  Plaintiff alleges that after the pictures were taken, he was examined by defendant Nurse[3] P.W. Harriman. (Compl. ¶ 32).  Plaintiff claims that defendant Harriman refused to give plaintiff any kind of treatment for his injuries and instead, sent him back to his cell, after making some sexual[4] slurs. *Id.*

The complaint explains the reason why believes he was the victim of the assault. (Compl. ¶¶ 22-26).  Plaintiff claims that the week before the May 1, 2008 incident, he was at the hospital because a nurse had given him the incorrect medication at his cell. (Compl. ¶¶ 22-24).  Plaintiff states that, after he resolved the medication issue with the nurse at the hospital, defendant Stoughton told plaintiff it was time to go, and ordered plaintiff to "take it down the hospital II stairs." (Compl. ¶ 25).  Plaintiff states that he began explaining to defendant Stoughton that he was just speaking to the nurse about medication, when defendant Stoughton told plaintiff that "he didn't give a shit what plaintiff was telling Nurse Bennett." *Id.*  Defendant Stoughton again told plaintiff to go down the stairs. *Id.*  Plaintiff claims that he turned to look at defendant Stoughton, but the defendant told plaintiff not to "look at him like that," using profane language.  Plaintiff states that he walked away, and there appears to have been no further discussion, but he is convinced that this incident was the reason that plaintiff was assaulted the following week. (Comp. ¶ 26).

---

[3] Defendant Harriman states that he is a registered nurse. (Harriman Aff. ¶ 1; Dkt. No. 40-5).

[4] Plaintiff alleges that defendant Harriman commented on how nice plaintiff's muscles were and asked plaintiff how much weight he could "bench press." (Compl. ¶ 32).

4

Plaintiff has two remaining[5] claims for relief:

(1)     Defendants violated plaintiff's right to be free from cruel and unusual punishment by using excessive force against him on May 1, 2008. (Compl. ¶¶ 35-42).  This claim includes allegations of conspiracy, of failure to intervene, and of failure to provide plaintiff with medical care after the assault.

(2)     Defendant Nurse Harriman was deliberately indifferent to plaintiff's serious medical needs on May 2, 2008 when plaintiff was examined the day after the alleged assault. (Compl. ¶¶ 46-50).

Plaintiff also names defendants Brian Fischer, the Commissioner of DOCS; and Dale Artus, the Superintendent of Clinton; as being responsible for both of plaintiff's claims because these individuals are responsible for the "policy, practice, supervision, implementation, and conduct of all matters at Clinton Correctional Facility . . .  and [were] responsible for the training, supervision, and conduct of all Clinton Correctional Facility personnel, including the defendants referenced herein." (Compl. ¶ 6).  Plaintiff claims that defendants Fischer and Artus were provided with reports of the uses of force at Clinton on a daily basis, and are responsible for making sure that the Clinton personnel obey the law. *Id.*

Finally, plaintiff names S.E. Racette, Deputy Superintendent of Security as a defendant. (Compl. ¶ 7).  Plaintiff states that defendant Racette was also responsible for the supervision, oversight, and discipline of all Clinton officers and security staff and was also responsible for the care, custody, and control of all inmates at Clinton.

---

[5] Plaintiff's second cause of action is against New York State alone. (Compl. ¶¶ 43-45).  On December 5, 2008, U.S. District Judge Sharpe dismissed the State of New York as a defendant to this action. (Dkt. No. 4).

(Compl. ¶ 7).  Plaintiff alleges that defendant Racette is also informed daily of any applications of force and other breaches of security at Clinton. *Id.*

### B.    Defendants' Evidence

In support of their motion for summary judgment, defendants have filed counsel's Local Rule 7.1(a)(3) statement (Dkt. No. 40-2), as well as the affidavits of defendants Christopher Stoughton (Dkt. No. 40-7) and Paul W. Harriman (Dkt. No. 40-5).  Plaintiff was deposed on June 17, 2009, and defendants have filed a copy of the deposition transcript. (Dkt. No. 40-9).

Prior to the May 1, 2008 incident, plaintiff was receiving Neurontin and Naprosyn, due to pre-existing arthritis and as the result of a fall down the stairs at Shawangunk Correctional Facility. (Defs.' Rule 7.1(a)(3) Statement, ¶ 2; Deposition Transcript ("DT") at 41-44.  At Clinton, inmates obtained their morning medication from a nurse, who visited their cells. (Defs.' Rule 7.1(a)(3) Statement, ¶ 3; DT at 44-45).  In order to obtain medication in the afternoon, inmates would participate in the "medication run" by going to Hospital II, escorted by corrections officers. *Id.*  During the medication run, inmates were escorted to Hospital II by companies and blocks. (Defs.' Rule 7.1(a)(3) Statement, ¶ 7; DT at 53).  Blocks from one side of the facility would go on the medication run first, while inmates from the other side ate dinner. (Defs.' Rule 7.1(a)(3) Statement, ¶ 8; Stoughton Aff. ¶¶ 8, 14; DT at 52).

On May 1, 2008, plaintiff was housed in C-Block, 5 Company, Cell No. 39, (C-5-39).  This cell was located on the east side of the facility. (Defs.' Rule 7.1(a)(3)

Statement, ¶ 9; Irwin[6] Aff. ¶ 4, Ex. 1).  On May 1, 2008, inmates from the east side of Clinton went on the medication run, and then went to the mess hall for dinner, while the inmates from the west side of the facility received their medication after dinner. (Defs.' Rule 7.1(a)(3) Statement, ¶¶ 10, 18; Stoughton Aff. ¶ 12, 14, Ex. 1; DT at 52, 53).  There is a facility-wide count at 3:00 p.m. in the afternoon, and another facility-wide count at 5:00 p.m. (Stoughton Aff. ¶ 5).  During the facility-wide counts, inmates were required to be in their cells.[7]  (Defs.' Rule 7.1(a)(3) Statement, ¶ 5; Stoughton Aff. ¶ 5).  The afternoon medication run began after the 3:00 p.m. facility count. (Defs.' Rule 7.1(a)(3) Statement, ¶ 6; Stoughton Aff. ¶¶ 3-8; DT at 52, 63-64).

On a medication run, the inmates were escorted from their cell blocks to a waiting room on the first floor of Hospital II. (Defs.' Rule 7.1(a)(3) Statement, ¶ 11; Stoughton Aff. ¶¶ 9-10; DT at 53).  Defendant Stoughton states that he was stationed on the second floor of Hospital II, where the medication window is located. (Stoughton Aff. ¶ 9; DT at 55-56).  Defendant Stoughton's procedure was to call down to the first floor and have ten inmates sent upstairs at a time.  *Id.*  When the group of ten inmates arrived at the second floor, defendant Stoughton would instruct the first inmate to go to the medication window, and the other nine inmates would be instructed to sit on a bench.  *Id.*

Each inmate would, in turn, go to the window, receive his medication.

---

[6] Tammy Irwin is a Clerk II in the Legal Office at Clinton who has submitted an affidavit, together with the Internal Movement History Display, showing that plaintiff was housed on the east side of the facility in C-5-39 cell on May 1, 2008. (Irwin Aff., Ex. 1; Dkt. No. 40-6).

[7] The exceptions are inmates who work in the mess hall and inmates who are inpatients in the hospital. (Stoughton Aff. ¶ 5).

(Stoughton Aff. ¶ 10).  At the medication window, the inmate must show the nurse his identification card. (Defs.' Rule 7.1(a)(3) Statement, ¶ 16; Harriman Aff. ¶ 11; DT at 60-62).  The nurse issues the inmate his medication, watches the inmate take the medication, and looks in the inmate's mouth after he is finished to make sure that the medication has been swallowed. *Id.*  When each inmate finished this procedure, he returned to sit on the bench. (Stoughton Aff. ¶ 10).

When all ten inmates were finished receiving their medications, defendant Stoughton instructed them to return to the first floor, and asked the first floor officer to send up the next group of ten. *Id.*  This procedure would then be repeated until all the inmates had received their medication. *Id.*  When the last group was finished getting medication, the officer escorted the inmates to the mess hall so that they could eat dinner. (DT at 64-65).  Defendant Stoughton states that all the inmates must be processed and returned to their housing blocks in time for the 5:00 p.m. count. (Defs.' Rule 7.1(a)(3) Statement, ¶ 20; Stoughton Aff. ¶ 15; DT at 65).  Plaintiff does not dispute that this is the procedure that was used on the day of the alleged incident.

The medical staff maintains a statistical record[8] of the number of inmates who are treated each day, including he number of inmates who received medication during the medication run. (Defs.' Rule 7.1(a)(3) Statement, ¶ 21; Harriman Aff. ¶¶ 9-10, Ex. 3). These medical statistics show that on May 1, 2008, 205 inmates received their medications on the afternoon medication run. (Defs.' Rule 7.1(a)(3) Statement, ¶ 22;

---

[8] The record is called the "Clinton Correctional Facility-Monthly Medical Statistics," and contains the relevant statistics for the entire month. (Harriman Aff. ¶ 9-10, Ex. 3).

Harriman Aff. ¶ 9-10, Ex. 3).  The run began at 3:05 p.m., with the inmates who were

inpatients at Hospital II. (Defs.' Rule 7.1(a)(3) Statement, ¶ 23; Stoughton Aff. ¶¶ 7, 8,

12, 13, 15, Ex. 1).  At 3:30 p.m., the inmates from the east side blocks, (including

plaintiff), began arriving at Hospital II for their medication, and inmates from the west

side of the facility began arriving at 4:10 p.m. *Id.*  Inmates who were in the yard

received their medications at 4:30 p.m. *Id.* The officers completed their count of

inmate inpatients at 5:00 p.m. (Defs.' Rule 7.1(a)(3) Statement, ¶ 23, Ex. 1).  In his

affidavit, defendant Stoughton states that he did not use any force on any inmate on

May 1, 2008. (Stoughton Aff. ¶ 18).

   Plaintiff requested an emergency sick call on the morning of May 2, 2008. (DT

at 112).  Plaintiff claimed that he had been assaulted by staff on May 1, 2008. (DT at

112-14).  A sergeant was called, and photographs were taken of plaintiff in his boxer

shorts. (Defs.' Rule 7.1(a)(3) Statement, ¶ 25; Harriman Aff.[9], Ex. 2a-h).  Defendant

Harriman, a registered nurse at Clinton, examined plaintiff in Hospital II at 10:35 a.m.

in conjunction with having the photographs taken. (Defs.' Rule 7.1(a)(3) Statement,

¶ 26, Harriman Aff. ¶¶ 3-4, Ex.3 at 2).  Defendant Harriman completed an "Inmate

Injury Report," stating that his examination revealed a superficial red mark on

plaintiff's right forearm and red marks on his forehead, but no swelling was noted.

(Defs.' Rule 7.1(a)(3) Statement, ¶ 27, Harriman Aff. Ex. 1[10]).  Defendant Harriman

states that the superficial marks that he noted in his report were the only abnormalities

---

[9] Defendant Harriman's affidavit has been filed electronically and "traditionally."

[10] The court notes that the second page of Exhibit 3 of the Harriman Affidavit is a copy of the Inmate Injury Report. (Harriman Aff., Ex. 3 at 2).

noted on plaintiff's body. (Harriman Aff. ¶ 4).  Defendant Harriman states that the

photographs taken of plaintiff are a fair and accurate representation of his condition on

May 2, 2008, and that contrary to plaintiff's assertions, plaintiff had no "large swollen

knots on his forehead."[11] (Harriman Aff. ¶¶ 7-8).  Defendant Harriman's conversation

with plaintiff consisted of that necessary to conduct the examination, and defendant

Harriman denies telling plaintiff that he had nice muscles, a nice chest, and asking him

how much weight he could bench press. (Harriman Aff. ¶ 5).

 Plaintiff filed a grievance in this action that was appealed through to the Central

Office Review Committee (CORC), the highest level of appeal for an inmate

grievance. (O'Donnell Aff. Ex. 1).  The alleged assault was also the subject of an

investigation by the DOCS Inspector General ('IG"). (O'Donnell Aff. Ex. 2).  At the

conclusion of the investigation, the IG determined that plaintiff's allegations were

"unsubstantiated." *Id.*

## II. <u>Summary Judgment- Legal Standards</u>

 Summary judgment is appropriate where there exists no genuine issue of

material fact and, based on the undisputed facts, the moving party is entitled to

judgment as a matter of law.  FED. R. CIV. P. 56; *Salahuddin v. Goord*, 467 F.3d 263,

272-73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the

---

[11] During plaintiff's deposition, he stated that defendant Deputy Superintendent ("DS")
Racette did not properly secure plaintiff's file because these photographs were missing for a time. (DT
at 126-27).  They had not been located at the time of plaintiff's deposition.  However, in an affidavit,
Angeline Dickerson, a Keyboard Specialist at Clinton, states that she found the photographs after "an
extensive search." (Dickerson Aff. ¶ 2; Dkt. No. 40-4).  Ms. Dickerson states that the photographs
had been misfiled in the file of Inmate Gaskin Jordan. (Dickerson Aff. ¶ 4).  Defense counsel states
that he provided plaintiff a set of the photographs during discovery. (O'Donnell Aff. ¶ 6, Dkt. No. 40-
8).

outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is

not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).   While a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

## III.   **Excessive Force**

### A.   **Legal Standards**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000).  To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency.'"  *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries.  *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9).  "The Eighth

Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### B.     Application

#### 1.     Defendant Stoughton

In this case, plaintiff alleges that he was brutally beaten, and defendants claim there was ***no use of force at all***.  The rule in determining whether to grant summary judgment is that credibility determinations, weighing evidence, and drawing

inferences are functions for the jury, not the court. *Blake v. Race*, 487 F. Supp. 187, 202 (E.D.N.Y. 2007) (citing *Anderson v. Liberty Lobby*, 477 U.S. at 255).[12]  Although this is a close case, and there is very limited evidence supporting plaintiff's contentions, this court cannot find that no rational jury could find that plaintiff was assaulted, as he claimed.

Defendant Stoughton states that he processed approximately 205 inmates through the medication run on May 1, 2008, and he had no time to pull plaintiff out of line, push him into a room and assault him, assisted by two unknown officers.  The records indicate that the "East meds" began at 3:30 p.m., and the "West meds" began at 4:10. (Stoughton Aff. Ex. 1).  According to the plaintiff the alleged assault took only thirty seconds (DT at 103), and thus, it could have occurred as he claimed, despite the tight time schedule for the medication run.[13]

---

[12] In *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005), the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately rely on contrary evidence presented by the defendant(s) to conclude, at the summary judgment stage, that no reasonable jury would credit the plaintiff's testimony.  This court finds that the *Jeffreys* exception should not apply in this case.  In *Jeffreys*, the plaintiff's claim that he was thrown out a third-story window by police officers was vitiated by his three prior statements that he jumped.  *Id.* at 552. While plaintiff certainly has made some inconsistent statements about the broader events of May 1, 2008 (as discussed below), he has been consistent about the circumstances of the alleged assault. And, as noted below, there is a witness statement and some medical evidence that support plaintiff's claims, although the defendants have presented significant contrary evidence.

[13] In his memorandum of law, defense counsel states that, given the number of inmates that were processed that day and the short period of time involved, the inmates would have each had, on average, approximately 33 seconds to receive their medications. (Defs.' Mem. of Law at 16). However, the court notes that plaintiff states that he was in the last group of "East meds." inmates. (DT at 57, 95).  Thus, there could have been additional time between the "East meds. inmates" leaving the Hospital II area and the "West meds." inmates arriving to afford sufficient time for the incident to occur.

At his deposition, plaintiff testified that he was the third inmate from the last to start back down the stairs after his group got their medications. (DT at 95).  Plaintiff testified that after he was pulled out of line and told to put his hands on the wall, the rest of the inmates went down stairs.  Officer Deborah Fitzpatrick was stationed at the door, and plaintiff states that he was pushed into the room and beaten after the inmates left, and Officer Fitzpatrick "locked the door." (DT at 97).[14]

During the IG investigation, defendant Stoughton told the investigator that he did not pull plaintiff out or line, or do anything else to him.  (Inspector General ("IG") Report, O'Donnell Aff., Ex. 2 at 2, Dkt. No. 40-8 at 18).  Officer Fitzpatrick told the investigator that, although she had no real recollection of the medication run on the day in question, she did not recall any inmates ever being pulled out of the line.  (IG Report at 2).  One of plaintiff's witness, inmate Gerald Gaines, told the investigator that, before he headed downstairs, he saw plaintiff pulled out of line and taken around by the nurse's station.  Although he could not see plaintiff at this point, Gaines claimed he heard "some smacks or something" coming from the where they had taken the plaintiff. (IG Report at 1-2).  Thus, at least one inmate witness corroborated plaintiff's claim that he was pulled out of the line, which defendant Stoughton denied doing.

In his complaint, plaintiff states that when he got back to his cell,[15] he told

---

[14] Plaintiff's letter to defendant Fischer also stated that he was not "rushed" until "everyone else was no longer on hospital two (2) [sic]." (Dkt. No. 44 at 16) (Plaintiff's Memorandum of Law).

[15] The court notes another inconsistency between the complaint and plaintiff's deposition testimony.  The complaint alleges that, after the assault, plaintiff was "escorted back to his cell all injured and bruised up." (Compl. ¶ 2).  Later in the complaint, plaintiff states that "after the assault,"

defendant John/Jane Doe 3 that he was in serious need of medical attention or treatment for all the bruises and contusions that he sustained on his forehead and lower back as the result of a brutal beating by staff. (Compl. ¶ 28). During his deposition, plaintiff testified that he went back to his cell, and when the company officer made his rounds, plaintiff reported that he "wanted to go to sick call." (DT at 110-11). The officer told plaintiff that he had to put in a "sick call slip." (DT at 111). Defense counsel asked if the "sick call slip" was "normal procedure," and plaintiff stated that it was, "unless you [sic] requesting emergency sick call, and they consider your issue an emergency." *Id.* Counsel asked whether plaintiff told "anybody" that his was an "emergency sick call," and plaintiff said that "I didn't say it was an emergency sick call. I just told them I needed to see a nurse." *Id.* Plaintiff testified that he did not put in a sick call slip at that time. (DT at 112). Instead, he waited until the next morning and reported that he wanted to go to emergency sick call." *Id.*

If plaintiff had been brutally beaten to the point where he could hardly walk back to his cell, it seems unlikely he would have opted not to tell the officer that he required an emergency sick call. However, plaintiff also states that one of his alleged assailants told him that if he reported the matter, he would leave the prison in a "body bag." (DT at 103). Thus, while plaintiff's statements about the events of May 1, 2008

---

he was "forced to walk back to his cell," and he could hardly walk. (Compl. ¶ 28). At his deposition, plaintiff testified that after the assault, he went to "chow" with the other inmates from the East meds. run, and then returned to his cell. (DT at 110). This last statement is consistent with the defendants' description of the normal procedure used for the medication run. Such inconsistencies in plaintiff's various statements may affect his credibility; but the court cannot determine credibility issues in a motion for summary judgment. *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (It is well-established that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for a court on a motion for summary judgment).

seem internally inconsistent, it is possible that immediately after the alleged incident, plaintiff was hesitant to report the use of force, and/or he was worried about being "written up"[16] if the medical personnel did not think that plaintiff's condition was an emergency.[17]  (DT at 111).

Plaintiff alleges severe and painful injuries, from *inter alia*, at least four to six blows to the forehead. (DT at 99, 103).  Plaintiff claims that he was kicked five times in the back, was hit with closed fists, and that this assault went on for 25-30 seconds. (DT at 99-104).  Plaintiff stated that he was trying to cover his face so that he would not lose his teeth or injure his eyes, which was why his forehead took the brunt of the assault. (DT at 102).  Plaintiff claimed to have had "two big knots on each side of my forehead with red bruises going around across my forehead from one side to the next." (DT at 104).  He later stated that his forehead was "very swollen." (DT at 119).  A review of the photographs taken the next morning, together with the medical records, indicates that there were no big knots on the sides of plaintiff's forehead.  However, nurse Harriman examined plaintiff the morning after the alleged assault and noted some superficial red marks on plaintiff's right forearm and red marks on his forehead, with no swelling. (Harriman Aff. Ex. 1).  Thus, although it seems clear that plaintiff

---

[16] Although plaintiff does not specifically state that he was afraid of being issued a misbehavior report if his medical issue was not an emergency, his deposition testimony suggests he had such a concern.  (DT at 111).

[17] Plaintiff states that he reported the incident the next morning at 7:00 a.m. and was interviewed by Sergeant Giambruno. (Compl. ¶ 31).  In his report, Sergeant Giambruno stated that he found out at 10:00 a.m. that plaintiff wished to see him about an assault. (O'Donnell Aff. Ex. 2 at 13).

has exaggerated his injuries,[18] there is some medical evidence that is consistent with plaintiff's claim that force was used against him.

In plaintiff's response to defendants' motion, plaintiff argues that his injuries would not have been apparent because of the color of his skin, and that the court should review the medical records, which plaintiff argues are consistent with his allegations.[19]  Plaintiff has submitted copies of his Ambulatory Health Record (AHR). (Dkt. No. 41 at 29-31).  This court has reviewed these records, and the only notations referring to an assault are those repeating plaintiff's "subjective" complaints. (Dkt. No. 41 at 29).  On May 2, 2008, Nurse Harriman referred to an "alleged assault" and states that "pt states staff assaulted me." (Dkt. No. 41 at 29).  On May 9, 2008, however, the AHR notation states that plaintiff complained that his pain had increased and was not improving "from incident at another facility." (Dkt. No. 41 at 30).  On May 23, 2008, the AHR entry states that plaintiff complained that his back pain was worse, and mentions the "assault," however, the note also states that plaintiff was "very theatrical in nature." *Id.*

Although it does not appear that plaintiff suffered any serious injury, there was some medical evidence supporting his claims of an assault.  The lack of a serious injury is not determinative as to whether excessive force was used.  *See Wright v. Goord*, 554 F.3d 255, 268-69 (2d Cir. 2009) (citation omitted).  The IG's investigation

---

[18] At his deposition, plaintiff testified that his forehead was swollen out about an inch on each side. (DT at 106-07).  No such swelling appears in the photographs taken of plaintiff on May 2, 2008.

[19] Plaintiff also testified at his deposition that no one could see the injuries immediately after the incident because he was wearing a "kufi" that covered his forehead. (DT at 98-99).

documented one witness who saw plaintiff being pulled out of line, which could be consistent with plaintiff's version of the events, and is inconsistent with the statements of defendant Stoughton.  Based on all of the evidence, this court finds that plaintiff's excessive force claim will turn on issues of credibility that the court cannot determine on a motion for summary judgment.  The court cannot conclude that no rational jury could find in favor of plaintiff, and therefore, summary judgment for defendants is not appropriate for plaintiff's excessive force claim. *See, e.g., Griffin v. Crippen*, 193 F.3d 89, 90-92 (2d Cir. 1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Sims v. Artuz*, 103 Fed. Appx. 434, 437 (2d Cir. 2004) (plaintiff's allegations that he was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries[20] were sufficient to withstand a summary judgement motion); *Dallio v. Sanatamore*, 9:06-CV-1154 (GTS/DRH), 2010 WL 125774, at *9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor

---

[20] The Second Circuit reversed the grant of summary judgment, which was based, in part, on the district judge's conclusion that the plaintiff  "would have suffered 'far greater injury than actually occurred' if his account [of the incident] were accurate."  *Id.*

19

injuries the plaintiff suffered and the substantial contrary evidence proffered by the

defendants); *Cicio v. Lamora*, 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *7-8

(N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that

defendant correction officer hit inmate several times after he was subdued and

helpless, despite "seemingly overwhelming" contradictory evidence, including the fact

that plaintiff suffered only a minor bruise).

### 2.    Unnamed Defendants

Plaintiff alleges that there were two other officers, in addition to defendant

Stoughton, who participated in the alleged assault. (Compl. ¶ 2).  Plaintiff did not

identify ***any*** individuals involved in the alleged assault during the grievance

investigation. (Dkt. No. 40-8 at 7).  Plaintiff identified defendant Stoughton, after

being shown a photo array, during the subsequent IG investigation. (Dkt. No. 40-8 at

18).  At that time, he also identified Officer Fitzpatrick[21] from a photo array as "the

officer who was working the gate in the infirmary area."  However, he stated that he

was unsure that he could identify the other officers who actually assaulted him. *Id.*

During his deposition, plaintiff stated that, if he could have identified the other

involved, he would have done so. (DT at 86).

On May 26, 2009, during discovery, defendants provided plaintiff with the

---

[21] It is unclear whether plaintiff thinks that Officer Fitzpatrick is a defendant in this action. During the IG investigation, plaintiff stated that the officer he identified (Officer Fitzpatrick) was "aware" of the assault on him.  However, plaintiff names two other John/Jane Does in this action who allegedly assisted defendant Stoughton with the assault.  There are no other John/Jane Doe defendants named, other that John/Jane Doe # 3, a housing unit officer, who is discussed below.  Plaintiff did not list Officer Fitzpatrick as a defendant when he filed this action, notwithstanding the fact that he knew her name, and he has never moved to amend his complaint.  Thus, Officer Fitzpatrick is not a defendant in this case.

names of the other officers who worked the 3-11 shift at Hospital II on May 1, 2008.

(*See* Exhibit A to the Affirmation in Opposition to plaintiff's Motion to Compel, ¶ 11,

Dkt. No. 29 at 6).  However, plaintiff has failed to move to amend his complaint to

name John/Jane Does 1-2.[22]

Plaintiff may not continue to maintain this action against defendants who have

not been named or served. *See Coward v. Town and Village of Harrison*, 665 F. Supp.

2d 281, 300-01 (S.D.N.Y. 2009) (plaintiff "'simply cannot continue to maintain a suit

against' the John Doe defendant").  Rule 4 of the Federal Rules of Civil Procedure

requires that a defendant be served within 120 days of filing the complaint. FED. R.

CIV. P. 4(m).  The failure to serve a defendant within 120 days of filing the complaint

may be a ground for dismissal of the complaint, unless good cause is shown for an

extension of that time. *Id.*  This court could recommend dismissal without prejudice

against unidentified defendants now, given that plaintiff has had ample time to name

them based on the information provided by defense counsel.  However, plaintiff was

never warned in the court's prior orders that the failure to identify and serve these

individuals could result in dismissal.  Thus, this court will now formally warn plaintiff

that, if he intends to maintain this action against any unnamed defendants, he must

promptly identify them, move to amend the complaint to add them as defendants, and

then request that the court order service on them.  Failing to do so will result in

dismissal of the complaint against these unnamed individuals.

---

[22] Because the remaining officers who worked the 3-11 shift in Hospital II were male, the
court assumes that any individual named would be male. (*See* DT at 86) (plaintiff states that the other
three officers on duty were male, Caucasian officers).

### 3.    Failure to Intervene

Plaintiff has raised claims of failure to intervene, although he does not specify which defendants were responsible to do so. (Compl. ¶ 38).[23]  In *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), the court held that an officer may be personally involved[24] in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so.  An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation, unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it.  *See Cusamano v. Sobek*, 9:06-CV-623, 2009 U.S. Dist. LEXIS 5283, *13-14 (N.D.N.Y Jan. 26, 2009)(citing cases).  If the "John Doe" officers did not actually hit plaintiff, but failed to intervene, then they might be liable for failure to intervene.  However, the unknown officers are not defendants in this action at this time.

During the IG investigation, plaintiff seemed to imply that Officer Fitzpatrick was "aware" of the assault.  (Dkt. No. 40-8 at 18).  However, this officer has not been named as a defendant, and is not even mentioned as a John/Jane Doe in the complaint. The only two John Doe defendants mentioned in the complaint were individuals who

---

[23] At his deposition, plaintiff testified that, other than defendant Stoughton, he does not know who was hitting him. (DT at 102).  Plaintiff stated that he could not see who was striking him after defendant Stoughton threw the first punch. (DT at 99, 102).

[24] This concept is based on the proposition that an individual defendant must be "personally involved" in the constitutional violation of which the plaintiff complains. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006); *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986).

allegedly physically participated in the assault or were present in the room in which
plaintiff was being assaulted.  During his deposition, plaintiff testified that Officer
Fitzpatrick "locked the door" after the inmates left the area; but it appears clear that
plaintiff does not allege that she participated in the assault. (DT at 97).  Additionally,
plaintiff states that the entire incident took 25 to 30 seconds, leaving very little time
for anyone to "intervene" in the incident.  Thus, at this time, there is no indication that
failure to intervene is a viable claim, and the court does not need to address it further.

## IV.   Medical Care

### A.   Legal Standards

In order to state an Eighth Amendment claim based on constitutionally
inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently
harmful to evidence deliberate indifference to serious medical needs." *Estelle v.
Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate
indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The
first element is objective and measures the severity of the deprivation, while the
second element is subjective and ensures that the defendant acted with a sufficiently
culpable state of mind.  *Id.* at 184.

#### 1.   Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate
medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279
(2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining
whether a deprivation is sufficiently serious also involves two inquiries.  *Id.*  The first

question is whether the plaintiff was actually deprived of adequate medical care.  *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id.*  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).  However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower.  *Id.*  If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone.  *Id.* (citing *Smith*, 316 F.3d at 185).  Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability.  *Id.* at 280.

### 2.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300

(1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care.  *Id.* (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.*  Deliberate indifference is equivalent to subjective recklessness.  *Id.* (citing *Farmer*, 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety.  *Id.*  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844.  Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001).  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted).  An inmate does not have the right to treatment of his

choice.  *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation.  *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.  *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate.  *Id.  See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983).  Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

### B.   Application

#### 1.   Defendant Harriman

In this case, plaintiff claims that defendant Harriman did not properly treat his injuries and used "sexual slurs" about plaintiff.  The alleged "sexual slurs" consisted of defendant Harriman asking how much plaintiff could bench press and telling plaintiff he had nice muscles.[25]  Even assuming that defendant Harriman made those comments to plaintiff, and that he felt insulted or harassed by them, inmates have no constitutional right to be free from harassment. *Greene v. Mazzuca*, 485 F. Supp. 2d 447, 451 (S.D.N.Y. April 26, 2007) (citing *Shabazz v. Pico*, 994 F. Supp. 460, 474

---

[25] The court does not find that such comments, while they may have been inappropriate, would even come close to "verbal harassment."

26

(S.D.N.Y. 1998)[26]).  Verbal harassment, inexcusable as it may be, does **not** rise to the

level of a constitutional violation. *Purcell v.  Coughlin*, 790 F.2d 263, 265 (2d Cir.

1986); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996).

To the extent that plaintiff claims that defendant Harriman failed to properly

treat plaintiff's injuries, this court finds that plaintiff's injury, consisting mostly of

"superficial red marks" was not "sufficiently serious to meet the objective test.

Plaintiff states that defendant Harriman did not give plaintiff "any kind of medical

treatment what-so-ever." (Compl. ¶ 32).  Plaintiff alleges that defendant Harriman

should have increased the pain medication. (Compl. ¶ 48).  However, based on

defendant Harriman's examination, no "medical treatment" was necessary.  The AHR

for May 2, 2008 states "no Tx at this time.  Inmate to f/u if needed." (Dkt. No. 41 at

29).  Plaintiff was already taking pain medication for his arthritis, and there was no

evidence of any serious injuries, notwithstanding plaintiff's claim that he had large

swollen knots on his forehead.  Even if defendant Harriman had been negligent in

determining that plaintiff's "injuries" did not require treatment, and that the pain

medication could not, or should not, be increased, these medical decisions would not

rise to the level of a constitutional violation.  Therefore, the complaint may be

dismissed as to defendant Harriman.

### 2.      John/Jane Doe # 3

Plaintiff alleges in his complaint that when he returned to his cell after being

---

[26] *Shabazz v. Pico* was vacated in part on other grounds unrelated to the harassment issue
in *Shabazz v. Pico*, 205 F.3d 1324 (2d Cir. 2000), *reported in full*, 2000 U.S. App. LEXIS 3404
(2d Cir. Feb. 24, 2000).

brutally beaten, he told this defendant that he was in "seriously [sic] need of medical attention and/or treatment for all the pain and bruises and contutions [sic] that he sustained on his forehead and lower back from being brutally assaulted by defendants . . . ." (Compl. ¶ 28). Plaintiff has never identified this defendant, and the court could recommend dismissal for failure to identify and serve this John/Jane Doe. Fed. R. Civ. P. 4(m). In addition, this court finds that plaintiff's medical care claim against this defendant is without merit and may be dismissed *sua sponte* under 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).

At his deposition, plaintiff admitted that he never told John/Jane Doe # 3 that his situation was an emergency. (DT at 111). When the officer told plaintiff to put in a sick-call slip as was the proper procedure for a non-emergency situation, plaintiff declined. (DT at 112). Instead, plaintiff reported the "emergency" the next morning. Whether plaintiff was afraid to report the incident or not, defendant John/Jane Doe # 3 could not have been deliberately indifferent to a serious medical condition that plaintiff did not mention. Thus, even if plaintiff had identified a defendant, this court finds that his claim against John/Jane Doe # 3 may be dismissed based on plaintiff's own description of the defendant's alleged conduct.

## V.  **Personal Involvement**

Defendants Fischer, Artus, and Racette argue that this case must be dismissed against these supervisory officials because they had no personal involvement in any of plaintiff's claims. The court agrees with the defendants and finds that the plaintiff does not allege sufficient personal involvement of any of the supervisory defendants.

## A.    Legal Standard

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability for any constitutional claim.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id.  See Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937 (2009) (stating that defendant could be liable under section 1983 if he failed to remedy constitutional violation after learning of it or was grossly negligent in managing subordinates who caused violation); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

### 1.   Defendant Racette

Defendant Racette is the Deputy Superintendent of Security (DSS) at Clinton. During plaintiff's deposition, he stated that DSS Racette did not do anything to plaintiff "personally," but he is suing defendant Racette because he did not secure plaintiff's file after the incident.[27] (DT at 126-27).  Plaintiff also stated that "these officers" do what ever they want to do, and then when an incident is reported, the DSS does not address it properly. (DT at 127).  It appears that plaintiff is asserting that DSS Racette did not investigate or handle the alleged assault properly.

Clearly defendant Racette did not participate in the assault; thus, there is no personal involvement based on actual participation in the alleged incident.  Although plaintiff claims that "these officers" do what they want to do, he does not claim that DSS Racette was grossly negligent in managing his subordinates.[28]  Personal involvement based on the failure to "remedy a wrong" after learning about it refers to failing to remedy an ongoing wrong that is capable of being addressed. *Colon*, 58 F.3d at 873.  In the case of an alleged assault, finding out about the assault after the fact does not render DSS Racette liable for the constitutional violation.

Additionally, the failure to properly investigate an inmate's complaint does not rise to the level of a separate constitutional violation.  Inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein*

---

[27] At the time of the deposition, plaintiff's photographs had not yet been found.  Thus, plaintiff was complaining that the supervisory officials did not "secure" his file.

[28] The fact that photographs of plaintiff were filed with the records of another inmate with the same last name hardly suggests gross negligence.

*v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (citing *Nieves v. Gonzalez*,

No. 05 Civ. 17, 2006 U.S. Dist. LEXIS 24302, *11-13 (W.D.N.Y. Mar. 2, 2006);

*Longi v. County of Suffolk*, No. CV-02-5821, 2008 U.S. Dist. LEXIS 25468, *22-23

(E.D.N.Y. Mar. 27, 2008)).  In order for a constitutional violation to have occurred,

the investigation itself must have resulted in a deprivation of a constitutional right.

*Faison v. Hash*, 03-CV-6475P, 2004 U.S. Dist. LEXIS 29151, *6 (W.D.N.Y. Apr. 23,

2004) (citing *Malloy v. City of New York*, 1996 U.S. Dist. LEXIS 16417, *6 (S.D.N.Y.

Nov. 7, 1996) (holding that warden's alleged failure to investigate assault by

correctional officer did not give rise to constitutional violation, where plaintiff failed

to show that warden could have anticipated, or had other direct involvement in, the

assault); *Gomez v. Whitney*, 757 F.2d 1005 (9th Cir. 1985) (a claim against a police

department for failure to investigate is insufficient to state a civil rights claim without

another recognized constitutional right being involved)).  Thus, this complaint may

also be dismissed as against Racette based on a lack of personal involvement.

### 2.    Defendant Artus

Defendant Artus is the Superintendent of Clinton.  At plaintiff's deposition, he

testified that he was suing defendant Artus because he failed to properly investigate

plaintiff's grievance.  Specifically, plaintiff stated that defendant Artus "did not

investigate my grievance long enough." (DT at 128).  Plaintiff claims that he was not

given sufficient time to determine the identities of his assailants. *Id.*  Because the

grievance was not properly investigated, and plaintiff was unable to identify the

corrections officers involved, the grievance was denied.[29] (DT at 128-29).  Plaintiff

states that defendant Artus "did not follow policy and procedure governed by the DOC

directive. . . . 4040 directive, grievance directive." (DT at 129).  Plaintiff also testified

that defendant Artus "allowed his officers to assault me and . . . did not investigate my

claim properly enough, and he also denied my grievance based on somebody else's

opinion without looking into the situation itself." (DT at 131).  Plaintiff also states that

defendant Artus did not follow the "Code of Ethics." (DT at 130).

     Clearly defendant Artus was not a physical participant in the assault, and as

stated above, a defendant's failure to properly investigate a grievance does not rise to

the level of either personal involvement in the assault, nor does it state a separate

constitutional claim.  Thus, the complaint may be dismissed as against defendant

Artus.

### 3.   Defendant Fischer

     Defendant Fischer is the Commissioner of DOCS, and there is no indication that

he was involved in the incident in any way.  Plaintiff wrote defendant Fischer a letter

on May 3, 2008, however, as stated above the failure to respond to a letter or the

---

[29] It is unclear why plaintiff is complaining about the quality of the investigation into this alleged incident.  The officers at Clinton responded immediately when plaintiff alleged that he had been assaulted.  His grievance was not denied solely on the basis that he could not identify his assailants, but also because there was no evidence to substantiate his claims. (O'Donnell Aff. Ex. 1) (Grievance Documents).  By May 9, 2008, plaintiff's claims were also being investigated by the IG. The IG's investigative report reveals that plaintiff was allowed to view a photo array, after which he identified defendant Stoughton, but told the investigator that he was not sure that he could identify the other officers. (O'Donnell Aff. Ex. 2; Dkt. No. 40-8 at 18).  He identified Officer Fitzpatrick in another photo array.  Thus, by July of 2008, plaintiff had identified the main assailant in this case and had already told the IG investigator that he did not think he could identify the others.  Thus, plaintiff's allegation that the supervisory officers violated his rights by failing to allow plaintiff enough time to identify the alleged perpetrators is frivolous.

failure to investigate an inmate's claim is insufficient to confer personal responsibility on the supervisory official. *See also Rivera v. Goord,* 119 F. Supp. 2d 327, 344 (S.D.N.Y. 2000).  Thus, plaintiff has alleged no personal involvement by defendant Fischer.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 40) be **GRANTED IN PART** and the complaint **DISMISSED IN ITS ENTIRETY as to defendants HARRIMAN, FISCHER, ARTUS, RACETTE**, **and JOHN/JANE DOE #3**, and it is further

**RECOMMENDED,** that defendants' motion for summary judgment be **DENIED** as against **defendant STOUGHTON**, and it is

**RECOMMENDED**, that plaintiff's cross-motion for summary judgment (Dkt. No. 41) be **DENIED**, and it is further

**RECOMMENDED,** that if the District Court adopts this recommendation, plaintiff be warned that the failure to identify John/Jane Does 1-2 and to move to amend the complaint to add named defendants will result in the dismissal of the complaint against any unnamed defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.


Dated:  August 31, 2010


Hon. Andrew T. Baxter
U.S.  Magistrate Judge